## FERTEL v. ADLER.

1. CONTRACTS—OFFER AND ACCEPTANCE.
    An offer does not become a binding contract until acceptance.

2. BROKERS—COMMISSION—OFFER TO BUY.
    Plaintiff real-estate broker was not entitled to commission for sale of real estate, where offer submitted to defendants did not carry out understanding and agreement of the parties in regard to the Federal income taxes payable by defendants.

3. EVIDENCE—JUDICIAL NOTICE—TAXATION.
    The Supreme Court takes judicial notice of the fact that the capital gains tax for an individual is far less than an income tax on dividends from a corporation (26 USCA, § 12[b] [1948], § 117[b], § 117[c][2] [1945]).

4. BROKERS—COMMISSIONS—ORAL CONTRACT—PERFORMANCE.
    A real-estate broker, seeking to recover commission for sale of property under an oral contract, has the burden of establishing the existence of, the definite terms of, and his own complete performance of the contract.

5. SAME—COMMISSION—ORAL CONTRACTS—PERFORMANCE.
    Jury's finding that plaintiff real-estate broker had sustained his burden of proof as to terms of oral agreement to sell real estate by exhibit containing an offer to purchase or performance of such agreement *held*, not sustained by evidence, where proposed sale of stock of corporation owning the property rather than the property was to reduce the tax liability and offer presented defendants was not such as to effect such reduction in tax liability.

6. SAME—COMMISSIONS—INSTRUCTIONS—EVIDENCE—CORPORATIONS—TAXATION.
    Failure of trial court to submit defendants' request to charge that transaction would be such as to subject them to but 1' income tax, a capital gains tax, from sale of stock of corpora-

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 37.
[2, 4, 5] 8 Am Jur, Brokers §§ 174–176.
[4, 5] 8 Am Jur, Brokers § 222.

tion owning office and store building and that the securing of a mortgage by their corporation and distribution of proceeds thereof to them as owners of the stock would have constituted a dividend which was gross income and not a capital gain,. hence, subject to a higher income tax was error in real-estate· broker's action for commission, in view of the testimony ad-- duced even when construed most favorably to plaintiff.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted January 5, 1954. (Docket No. 1, Calendar No. 45,869.) Decided February 18, 1954.

Assumpsit by Max Fertel against Leo Adler and Paul Monchnik for real-estate broker's commission claimed for procuring sale of their property. Verdict and judgment for plaintiff. Defendants appeal. Reversed.

*Shapero & Shapero,* for plaintiff.

*Arthur J. Hass,* for defendants.

BUTZEL, C. J.   Max Fertel, plaintiff, a licensed real-estate broker, brought suit against Leo Adler and Paul Monchnik, defendants, the owners of 40 shares each of the 80 shares constituting the entire· issue and outstanding capital stock of the Tobin. Building Corporation, a Michigan corporation, which owned a large 8-story building used for stores and offices at 1308 Broadway, Detroit, Michigan. By virtue of the ownership of all the stock, the defendants indirectly were considered the owners of the prop-- erty although the corporation was the real owner. Plaintiff heard that the property was for sale and during the month of May, 1948, solicited a sales agency from defendants. In the original conversa-. tions in regard to the sale of the property, for which defendants asked a price of $250,000, it developed that the property belonged to the corporation which.

would be obligated to pay a Federal income tax on
the profit that the corporation would make in selling
the property and that upon the subsequent payment
of the proceeds from the sale as dividends to defend-
ants as stockholders, they, in turn, would be obli-
gated to pay an income tax upon that amount.
During negotiations the parties determined that if
the stock were sold instead of the property, the de-
fendants would have to pay only one tax upon capital
gains and that a sale could be made in this manner.
Defendants agreed that they would accept $225,000
if such sale required the payment of only a capital
gains tax. There was a $45,000 mortgage on the
property. Evidently through negotiation a commit-
ment or representation had been made by an agent
of the mortgagee that a new mortgage loan of $130,-
000 would be made. This would enable the corpora-
tion to pay off the $45,000 mortgage and leave $85,000
in the treasury of the corporation which would be
paid over to defendants. It was suggested that this
be taken into consideration in the purchase price so
that it would require only an additional $95,000 in
cash from a purchaser to acquire the property sub-
ject to a $130,000 mortgage if the $85,000 surplus
over the present mortgage were paid over to de-
fendants in the form of a dividend. Defendants
would thus receive $85,000 in dividends from the
corporation and $95,000 from the purchaser of the
stock. No agreement was reduced to writing except
the admitted offer from one M. J. Saffir, referred to
as exhibit 3, which stated as follows:

"Detroit, Michigan,
"July 19, 1948.

"Messrs. Leo Adler and Paul Monchnik,
"Detroit, Michigan:

"*Gentlemen:*

"The undersigned hereby submits the following of-
fer for the purchase of all the outstanding and issued

shares of stock of the Tobin Building Corporation, a Michigan corporation, it being understood that there is now 80 shares of the said stock outstanding, 40 shares being owned by Leo Adler and 40 by Paul Monchnik and that there is no other outstanding stock, upon the following terms and conditions:

"(a) That the Tobin Building Corporation evidence the unencumbered ownership of the building at 1308 Broadway, Detroit, Michigan, except for a mortgage as hereinafter stated.

"(b) That the proper officers of the Tobin Building Corporation certify the facts and figures as set forth in the schedules contained in exhibit A.

"(c) That a certified statement be made by duly authorized officers of the Tobin Building Corporation that there are no existing building violations.

"(d) That the Tobin Building Corporation obtain a mortgage on the building owned by it known as 1308 Broadway, said mortgage to be in the sum of $130,000 and to be payable at the rate of $1,170 per month with interest at 4-1/2% per annum.

"(e) That upon the acceptance of this offer by you, the offerer or its duly designated accountants (Isenberg, Purdy and Donovan) shall have access to the books and records of the Tobin Building Corporation in order to check facts and figures as set forth in schedule A and as verbally conveyed to the offerer. At the completion of the said examination, the said accountants shall then designate a reasonable surety bond to be provided at the time of closing of this deal by the sellers, Adler and Monchnik, said bond to indemnify the purchaser against any tax liability which may be assessed against the Tobin Building Corporation for the period of operation up to and including the date of closing of this transaction.

"(f) The full purchase price of the said stock shall be $225,000 and the sum of $5,000 is herewith submitted as a deposit subject to the fulfillment of all the terms and conditions herein enumerated, and

upon such fulfillment the balance of $220,000 is to be paid on or before September 15, 1948.

"(g) In event the offerer desires an extension of 30 days to pay the balance of the purchase price, he shall pay an additional $10,000 on or before September 15, 1948, or at such time as he requests the said extension.

"In event that the Tobin Building Corporation pays any real-estate tax for the year of 1948, the purchase price of the said stock shall increase in the amount of the said tax.

"This offer to be null and void and ineffective unless duly accepted within 7 days from the date hereof.

"Very truly yours,
Corporation to be Formed
By: (sgd) M. J. SAFFIR

"Accepted by:

<hr>

Leo Adler

<hr>

Paul Monchnik"

The offer was never accepted by defendants.

One difficulty in the case arises from the fact that the transaction arose as a sale of real estate, then developed into one for the sale of securities or stock, and ended in a mixed transaction, the nature of which we shall not even try to determine. Exhibit 3 was an offer and never became a binding contract between defendants and the purchaser though so described in plaintiff's brief. Plaintiff admitted in his direct examination that when he delivered exhibit 3, together with a check for $5,000 referred to therein, to defendant Monchnik, plaintiff stated to the latter that plaintiff "had a bona fide offer for the

building according to my—our understanding."
Monchnik read it over carefully and stated, as testified to by plaintiff:

"It seems to me everything is all right, as far as I know, except we will have to take it down to my attorney to see that the offer is prepared in such a manner that we won't have to pay any double taxation * * * that is income tax, except a capital gain, selling the stock in the corporation."

On cross-examination plaintiff also admitted that he knew that one of the essentials of the transaction was to save an income tax on a distribution by the corporation. When defendants presented the offer to their attorney, he asked plaintiff to withdraw from the room. The attorney evidently advised defendants that they would have to pay the tax on the distribution by the corporation and possibly also a capital gains tax. The payment of only a capital gains tax unquestionably was the fundamental basis of the entire negotiations. Defendants refused to proceed any further with the transaction although defendant Adler, according to testimony of plaintiff, said that he was willing to do so but that his associate had "reneged" on the deal. The use of the word is of no significance. The sale never was consummated. Defendants refused to sign an agreement to pay commission. Plaintiff brought suit.

Defendants deny liability on many grounds. They claim in the first instance that even viewing the transaction as one for the sale of securities plaintiff had never been licensed to sell securities under the provisions of the blue sky law, as amended. CL 1948, §§ 451.102, 451.103, 451.105 and 451.121 (Stat Ann §§ 19.742, 19.743, 19.745, 19.761). Plaintiff stresses the fact that he was not in the business of offering securities for sale; that this was the first transaction of that kind he had ever had; and that he was in the

real-estate business and not in the stock-brokerage business. It is further claimed that this was a single transaction by the owners of the stock and that the case is controlled by *Miller* v. *Stevens,* 224 Mich 626, and *Morris* v. *O'Neill,* 239 Mich 663.

Plaintiff claimed that exhibit 3, the offer submitted by plaintiff, signed "Corporation to be Formed, by M. J. Saffir," was an offer of a person who was ready, willing and able to perform. Plaintiff calls attention to the Michigan general corporation act, section 8 (CL 1948, § 450.8 [Stat Ann § 21.8]), which holds that a contract made by incorporators for and in behalf of any corporation to be formed should not be deemed invalid or ineffectual because made prior to the filing of the articles. Plaintiff also relies on the case of *Campbell* v. *Rukamp,* 260 Mich 43, showing the individual liability of a party representing to act for a corporation. Defendants claim that the tender of the $5,000 in the form of a check instead of currency was not a good offer. No objection was made to the form of the tender until the time of the trial. Further objection is made to the fact that paragraph (d) of exhibit 3 obligates the corporation to obtain a mortgage of $130,000 on the property. Defendants claim that any agreement pertaining to the placement of a mortgage on real property is within the statute of frauds and is required to be in writing, *Wardell* v. *Williams,* 62 Mich 50 (4 Am St Rep 814); *Tromley* v. *Lange,* 236 Mich 240, and that as the placing of a mortgage was a component part of the commission agreement, it was void since the entire contract was inseparable and there was no written contract to evidence the placing of a mortgage. *Colonial Brick Co.* v. *Zimmerman,* 255 Mich 655. Plaintiff, however, claims that the commitment for the mortgage of $130,000 had already been made and at most the commission agreement was a contract for services. We need not decide these ques-

tions or many others raised because the offer obviously did not carry out the understanding and agreement of the parties in regard to the Federal income taxes. Defendants requested the court to charge the jury that both plaintiff and the defendants agreed that they had an understanding that the defendants would be subject to only one income tax item, to-wit: the capital gains tax not to exceed 25% of their profit if a sale of the stock was effectuated and that if the corporation had accepted the mortgage loan of $130,000 on the Tobin Building and distributed the net proceeds of the loan to the defendants, such distribution would have constituted a dividend to the defendants and would have been gross income and not a capital gain. This refusal to charge is one of the many reasons and grounds for appeal.

Plaintiff testified as follows:

"Mr. Adler told me that 'if he would sell the building it would have to be a dividend to the stockholders. Then it would be a double taxation from income tax.'
\* \* \*

"Mr. Monchnik said to Mr. Hass: 'I have an offer here which we would like to close the deal; I want you to look over the offer and see whether we are protected from any additional taxation beside the capital gains tax.'"

Although at other times plaintiff denied that a tax benefit or saving to the seller was the fundamental basis of the proposed sale, he testified he understood that to be one of the essentials of the sale he was to arrange for the defendants. In addition, plaintiff must have clearly understood the motive of the defendants in considering the sale since if a tax saving was not the very essential of the proposed transaction, the query arises why plaintiff who was in the real-estate business would for the first time have arranged for the sale of stock rather than the sale

of the building as was originally contemplated. We take judicial notice of the fact that the capital gains tax is far less than a tax on dividends when the recipient would have a dividend of $42,500, or one-half of the proceeds from the new mortgage of $130,-000 after payment of the $45,000 mortgage. See 26 USCA, § 12(b) (1948), and 26 USCA, § 117(b), § 117 (c) (2) (1945), the applicable sections of the internal revenue code for the year 1948.

Plaintiff further testified on cross-examination:

"*Q.* Or was that $130,000 to be deducted from the $225,000?

"*A.* To be deducted.

"*Q.* I see; and a balance was to be paid by the Tobin Building Corporation to Leo Adler and Paul Monchnik; is that correct?

"*A.* The corporation's potential purchaser was to pay him the difference between $225,000 and $130,000.

"*Q.* Then will you explain to me and to this jury how Leo Adler and Paul Monchnik would get the $130,000?

"*A.* By simply getting the mortgage on the property.

"*Q.* But when the mortgage was placed the Tobin Building Corporation would receive that $130,000 and it would become cash on hand or in the bank of the Tobin Building Corporation; isn't that correct? You're an experienced real-estate man; you know that?

"*A.* I understood that that was the mechanics of negotiating the deal; that would only require say, $90,000 after the acquiring of the building, subject to the mortgage of $130,000, and the corporation would get a mortgage where the former shareholders would get the money from the mortgage proceeds. There was a small mortgage at the time.

"*Q.* And the small mortgage would be deducted from the big mortgage and that other mortgage money would be paid for Leo Adler and Paul Monchnik?

"*A.* Right.

"*Q.* By the Tobin Building Corporation?

"*A.* Right.

"*Q.* Now, you knew the very essentials of the way they wanted to make this deal was to save an income tax on a distribution on the corporation to them, didn't you?

"*A.* Yes.

"*Q.* You knew that the corporation would have to pay to them out of its funds $120,000 of its own money?

"*A.* The profits, if you please, was above the $160,-000 purchase price that Mr. Leo Adler and Mr. Monchnik paid so therefore it wouldn't make any difference. The $130,000 mortgage, what they were interested in, is not to pay a big tax on the profit of the stock.

"*Q.* But the reason they wanted to sell their stock was because they only wanted to pay an income tax between what the stock cost them and what they sold it for; isn't that right?

"*A.* I presume so.

"*Q.* That is correct; they did not want to pay any income tax on any dividends received from the corporation?

"*A.* That part I don't know.

"*Q.* Well, they told you that?

"*A.* They claimed they didn't want to pay a double taxation.

"*Q. That is right, so they didn't want to pay an income tax on any dividend from the corporation?*

"*A.* That is correct.

"*Q.* Now, you knew that, didn't you?

"*A.* All I knew is what they told me. They told me they are not interested in selling the building because it would be a double taxation but if I could find a purchaser to buy the entire stock and then change the officers so the corporation would be still in existence and there is a mortgage available for $130,000 and therefore the new purchaser—all he would need is $95,000 cash to acquire the stock.

"*Q.* In other words, all that—and this is definite—Mr. Saffir would have to pay for the stock would be $95,000; is that correct?

"*A.* Yes." (Italics supplied.)

While plaintiff's attorneys in their brief stated this testimony is due to a "possible error" on plaintiff's part, and that under exhibit 3 defendants could have demanded the full price of $225,000 for their stock, and still be entitled to any distributions by the corporation made prior to the time the title to the stock passed, this would leave an absurd result. Defendants under this theory would withdraw in dividends the $85,000, the difference between the $130,000 under the new mortgage if made and the $45,000 mortgage on the property, and also receive $225,000, or in all $310,000 for the property, far more than they ever asked or were entitled to.

Plaintiff's right to recover his commission depended upon proof of the existence and performance of an oral contract. There was no written contract under which defendants agreed to pay plaintiff a commission. A performance by the plaintiff whereby the defendants would not receive the tax benefits contemplated by them, the inducing motive for their proposed sale, was not an act for which the defendants agreed to pay a commission. In more explicit terms, the defendants agreed to pay a commission to plaintiff if he furnished a purchaser who would buy the defendants' stock upon such terms that the sale of stock would constitute only a capital gains transaction.

To determine whether the proposed terms of purchase created this tax benefit, the defendants submitted the offer of purchase to their attorney. In his opinion the terms of purchase were unfavorable in regard to the tax position of the defendants. Upon his advice, the defendants refused to accept the offer submitted. According to the contract as established

by the evidence, the plaintiff, in this action for commission under the contract, had the duty of proving complete performance, that is, proving that the terms of purchase were such that the defendants would attain the beneficial tax position that they desired. Upon this point the plaintiff offered no proof but relied solely upon exhibit 3 as containing the complete agreement contemplated by the parties.

Plaintiff during cross-examination stated as follows:

"*Q.* But when the mortgage was placed the Tobin Building Corporation would receive that $130,000 and it would become cash on hand or in the bank of the Tobin Building Corporation; isn't that correct? You're an experienced real-estate man; you know that?

"*A.* I understood that that was the mechanics of negotiating the deal; that would only require say, $90,000 after the acquiring of the building, subject to a mortgage of $130,000, and the corporation would get a mortgage where the former shareholders would get the money from the mortgage proceeds. There was a small mortgage at the time."

Counsel for plaintiff in the brief on appeal now attempt to avoid the implication of plaintiff's testimony during the trial in regard to the agreed terms of the transaction. But one must not lose sight of or ignore the burden upon plaintiff of establishing the existence of, and the definite terms of, the oral contract which he alleged existed and was performed on his part. Plaintiff's clear testimony was in contradiction to the position now taken on appeal that the purchaser was obligated to pay the full stock purchase price of $225,000 from the purchaser's own funds. In effect, and it is admitted by plaintiff on appeal, plaintiff submitted an offer of purchase to the defendants which was capable of various interpretations or constructions. Defendants doubted

whether the offer incorporated the tax benefits they expected, and for that reason wanted to consult their attorney who advised them that it involved more than a capital gains tax.

The finding of the jury that the terms of the contract were fully set forth in exhibit 3 is not borne out by the evidence. Plaintiff's own testimony in direct and upon cross-examination was explicitly to the effect that he understood that the purpose of the proposed sale of stock rather than the property was to reduce the tax liability of the defendants.

Construing the evidence in the light most favorable to the plaintiff at the close of his case, it is clear that plaintiff did not prove the performance of the contract that he claimed had been entered into. There was no proof that the offer as submitted to the defendants would provide a sale of stock in which the Federal income tax liability of the defendants would be limited solely to that of a capital gains transaction. Proof of this performance was essential to the plaintiff's right to recover.

Defendants in their requests to charge asked that the jury be instructed as follows:

"I charge you further that both the plaintiff and the defendants agree that they had an understanding that the defendants would be subject to only 1 income tax, to-wit, a capital gains tax not to exceed 25% of their profit if a sale of the stock was effectuated. I charge you that the defendants had the legal right to minimize their income-tax liability. I charge you that if the corporation had secured a mortgage loan in the amount of $130,000 on the Tobin Building and had distributed the proceeds of such loan to the defendants, such distribution would have constituted a dividend to the defendants and would have been gross income and not a capital gain. I charge you further that the income-tax rate applicable to such income was higher than the rate applicable to taxes upon capital gains. I charge you further that the

incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step from the commencement of negotiations to the consummation of the sale is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title."

The trial judge neglected to give this charge or its contents as far as it affected the Federal taxes on the transaction. Defendants were entitled to such a charge and the failure to give it was error. In view of the plaintiff's testimony and admissions in the record before us in establishing the terms of the oral contract, this charge would have been the equivalent of directing a verdict for the defendants. A tax saving was the basic purpose and an essential element of the proposed transaction and plaintiff did not prove that the offer of purchase he procured for the defendants embodied a tax-saving transaction.

The judgment upon the verdict in the trial court is reversed, with costs to the defendants. An order will enter remanding the case to the trial court with directions to set aside the judgment in plaintiff's favor and to enter a judgment for defendants.

CARR, BUSHNELL, SHARPE, BOYLES, REID, DETHMERS, and KELLY, JJ., concurred.